# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

| | | |
|---|---|---|
| **RICHARD L. SCOTT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:** |
| | ) | |
| **DAWN K. ROBERTS, et al.** | ) | **4:10-cv-00283-RH-WCS** |
| | ) | **(Oral Argument Requested)** |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant, Florida Secretary of State Dawn K. Roberts, provides this response in

opposition to the Plaintiff's Motion for a Preliminary Injunction. Plaintiff Richard L. Scott

("Scott") fails to meet the four criteria necessary for injunctive relief. No substantial likelihood

of success exists on his First Amendment claim; his claim of irreparable harm is unsupported;

and the public interest and balance of harms both weigh against the injunctive relief he seeks.

## BACKGROUND

Less than three weeks after his chief opponents in Florida's gubernatorial race filed

irrevocable statements opting into public campaign financing under the Florida Election

Campaign Finance Act[1] (the "Act"), Scott asks this Court to enjoin the operation of a crucial

provision of the Act that would disburse campaign funds to his opponents. While Scott frames

his argument as an infringement on his First Amendment right to speak on behalf of his

campaign, the challenged statute does not restrict the amount of speech that Scott may engage in

or the amount of money he may spend engaging in political speech. It is undisputed that the

Florida Election Code allows Scott to make unlimited personal contributions to his campaign

---

[1] §§ 106.30-106.36, Fla. Stat.

committee, to engage in unlimited campaign expenditures, and to make unlimited contributions to other political organizations (so-called "527" committees), with which he may coordinate his efforts – again, without limitation.

The last-minute injunction sought by Scott would disrupt the orderly operation of Florida's system of public campaign financing in the critical final weeks before the primary election. The injunction would frustrate the State of Florida's compelling interest in preventing corruption and the appearance of corruption, as well as its interest in encouraging candidate participation in the public campaign financing system. Finally, the injunction would deny Scott's electoral opponents the benefit of the bargain they struck when they agreed to participate in public campaign financing under the existing statute.

For these reasons and those set forth in detail below, Florida Secretary of State Dawn K. Roberts respectfully requests that this Court deny the Plaintiff's Motion for a Preliminary Injunction.

## STATEMENT OF FACTS

## I.   THE FLORIDA ELECTION CAMPAIGN FINANCING ACT

### A.   History of the Act

In 1986, the Florida Legislature adopted the Florida Election Campaign Finance Act, the purpose of which is "to preserve the integrity of the election process by supporting candidates who are free from the influence of special interest money and to remove corruption and the appearance of corruption from that process." *Connor v. Division of Elections*, 643 So. 2d 75, 77 (Fla. 1st DCA 1994) (citing *State v. Republican Party of Florida*, 604 So. 2d 477 (Fla. 1992)). The codified statement of legislative intent expresses the concern that the public perceived political contributions from "special interests" could unduly influence government officials to

the detriment of the public interest.  § 106.31, Fla. Stat.  The Legislature therefore intended the Act "to alleviate these factors, dispel the misperception, and encourage qualified persons to seek statewide elective office who would not, or could not, otherwise do so and to protect the effective competition by a candidate who used public funding."  § 106.31, Fla. Stat.

The provision of the Act challenged in this case, Section 106.355, was adopted in 1991 as part of a comprehensive "campaign finance reform bill" that, among other things, reduced campaign contribution limits for statewide candidates from $3,000 to $500, prohibited the solicitation or acceptance of campaign contributions in government buildings, and amended other provisions of the Act.  Ch. 91-107, Laws of Fla.  As noted by the First District, the Legislature's purpose in enacting the Act was to "remove corruption and the appearance of corruption" from the election process.  *Connor*, 643 So. 2d at 77.

Florida's Constitution Revision Commission later proposed an amendment to the Florida Constitution, adopted by the voters in 1998, to reiterate the state's public policy supporting public financing of campaigns as a way to "provide for state-wide elections in which all qualified candidates may compete effectively."  Art. VI, § 7, Fla. Const.

### B.     Operation of the Florida Election Campaign Financing Act

Although Scott challenges only one provision of the Act, to understand the operation of Section 106.355, Florida Statutes, and its impact on both candidates who elect to receive public campaign financing ("participating candidates") and those who do not ("non-participating candidates"), it is necessary to review the Act's larger statutory scheme.

Under the Act, public campaign financing is available to candidates for statewide office, *i.e.*, the Governor and members of the Cabinet.[2]  § 106.33, Fla. Stat.  Upon qualifying for office,

---

[2] Because Scott is a candidate for Governor, the remainder of this Response will address the provisions of the Act applicable to gubernatorial candidates rather than the somewhat different standards for Cabinet candidates.

candidates seeking to participate in public campaign financing must file a request for such financing with the Division of Elections. *Id.*

To be eligible to receive contributions, a candidate must agree to abide by the expenditure limits for the 2010 election cycle. § 106.33, Fla. Stat. For the Governor and Lieutenant Governor (who are treated as a single candidate), the expenditure limit for the 2010 election cycle is $24,901,170 ($2 for each registered voter). § 106.34, Fla. Stat.; Declaration of Sarah Jane Bradshaw ("Bradshaw Declaration") at ¶ 6.

In addition, a participating gubernatorial candidate is not eligible to receive matching funds until he or she raises at least $150,000 in "qualifying matching contributions" – contributions of $250 or less made after September 2009 from individuals who are state residents at the time they contribute. § 106.35(2)(b), Fla. Stat. Participating candidates must agree to limit loans or contributions from their own personal funds to $25,000 and to further limit contributions from national, state, and county executive committees of a political party to $250,000 in the aggregate. § 106.33(3), Fla. Stat.

All gubernatorial candidates, both participating and nonparticipating, must file regular reports of contributions received. § 106.07, Fla. Stat. The following chart sets forth the reporting schedule for the August 24, 2010, Primary Election:

### 2010 Primary Election Reports

| Due Dates | Period Covered |
|---|---|
| Friday, July 23, 2010 | April 1 – July 16, 2010 |
| Friday, July 30, 2010 | July 17 – July 23, 2010 |
| Friday, August 6, 2010 | July 24 – July 30, 2010 |
| Friday, August 13, 2010 | July 31 – August 6, 2010 |
| Friday, August 20, 2010 | August 7 – August 19, 2010 |

Bradshaw Declaration at ¶ 10.

Scott has limited his constitutional challenge to only one provision of the Act: Section 106.355, Florida Statutes, which addresses nonparticipating candidates exceeding the expenditure limits for participating candidates.  When a candidate who has chosen not to participate in public financing exceeds the expenditure limit in Section 106.34, all opposing participating candidates are released from the expenditure limit to the extent the nonparticipating candidate exceeded the limit.  § 106.355, Fla. Stat.  These participating candidates are still eligible for matching contributions up to such limit and are not required to reimburse any matching funds that are provided pursuant to Section 106.355, Florida Statutes.  However, the participating candidates remain bound by the limits on personal and party contributions in Section 106.33(3), Florida Statutes.

Within seven days after a request by a participating candidate, the Department of State must provide the candidate with funds equal to the amount by which the nonparticipating candidate exceeded the expenditure limit.  § 106.355, Fla. Stat.  These matching funds are capped at twice the amount of the expenditure limits for participating candidates specified in Section 106.34, Florida Statutes.  *Id.*

**Note:** Although Section 106.355 states that the public funds available to candidates are not considered "matching funds," the cases discussing this model of supplemental public contributions to participating candidates in other states universally refer to these contributions as "matching funds."  For the sake of clarity, this Response will follow this practice and use the term "matching funds" to refer to the funds available under Section 106.355, Florida Statutes.  As used herein, the term "matching funds" <u>does not</u> include the "matching funds" or "matching contributions" available to participating candidates under Section 106.35, as the Complaint is expressly limited to the category of matching funds addressed in Section 106.355.

## II.   CANDIDATE QUALIFYING FOR THE 2010 ELECTIONS IN FLORIDA

The qualifying period for the 2010 general election began on June 14, 2010 and ended on June 18, 2010.  Bradshaw Declaration at ¶ 4.  Fourteen candidates[3] qualified to seek the office of Governor.  Bradshaw Declaration at ¶ 5.  Of the fourteen qualified candidates, seven candidates submitted a request for public campaign financing from the Trust Fund.  Bradshaw Declaration at ¶ 6.  These "participating candidates" are Lawton "Bud" Chiles, Daniel Imperato, Farid Khavari, Josue Larose, Bill McCollum, C.C. Reed, and Alex Sink.  Bradshaw Declaration at ¶ 6. Scott did not submit a request to participate in public campaign financing.  Bradshaw Declaration at ¶ 8.

The requests executed by these candidates provide, in part:

> I agree to abide by the expenditure limits provided in Section 106.34, Florida Statutes.  I understand that I am not eligible for matching contributions until I receive contributions equal to $150,000 (in the case of a candidate for Governor) or $100,000 (in the case of a candidate for Cabinet office).  Contributions received from individuals for $250 or less made after September 1 of the calendar year prior to the election will be eligible for match. Aggregate contributions from individuals in excess of $250 will be matched only up to $250.  Contributions for both threshold amounts and qualifying matching contributions must be from individuals who are Florida residents.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy."  *Horton v. City of St. Augustine*, 272 F.3d 1318, 1326 (11th Cir. 2001).  "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated."  *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001).

---

[3] The candidates who qualified for the office of Governor are: Peter L. Allen (IDP), Michael E. Arth (NPA), Karl Behm (WRI), Lawton "Bud" Chiles (NPA), Daniel Imperato (NPA), Farid Khavari (NPA), Josue Larose (WRI), Mike McCalister (REP), Bill McCollum (REP), Brian P. Moore (DEM), C.C. Reed (NPA), Rick Scott (REP), Alex Sink (DEM), and John Wayne Smith (LIB).

When, as here, the movant seeks to alter rather than maintain the status quo, courts generally exercise a higher degree of scrutiny. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995).

In this case, Scott seeks an injunction barring the Secretary of State from disbursing funds to participating candidates in accordance with a statute that has been part of Florida's public campaign financing system for nearly 20 years. This would be a drastic change of the status quo and Scott accordingly bears a heavy burden of persuasion.

To obtain a preliminary injunction, the movant must clearly establish the following factors: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction would not be adverse to the public interest. *Florida Democratic Party v. Hood*, 342 F.Supp.2d 1073, 1076 (N.D. Fla. 2004) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306) (11th Cir. 1998)). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites." *Robertson*, 147 F.3d at 1306.

Scott's motion should be denied because it falls well short of the necessary showing for the extraordinary and drastic remedy of a preliminary injunction.

## I.      SCOTT DOES NOT HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS[4]

Scott does not have a substantial likelihood of success on the merits of his challenge to the "matching funds" available to participating candidates under Section 106.355, Florida Statutes, because, as described below, the matching fund provisions are constitutional. To the

---

[4] The Plaintiff's Motion for a Preliminary Injunction and its supporting memorandum address only the likelihood of success on Count I of the Complaint. This Response is accordingly limited to the First Amendment issue.

extent that matching funds impose any burden on the speech of nonparticipating candidates, the burden is minimal and indirect and is sufficiently justified by the State of Florida's recognized interests in preventing corruption and the appearance of corruption, and encouraging candidates to participate in public campaign financing.

The Complaint does not challenge the constitutionality of the Florida Election Campaign Finance Act in its entirety.  Indeed, the constitutionality of public campaign financing in general is not in doubt.  The Supreme Court established conclusively in *Buckley v. Valeo* that "Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations."  424 U.S. 1, 57 n. 65 (1976).  The Court found that public financing of elections "furthers, not abridges, pertinent First Amendment values" by "facilitat[ing] and enlarg[ing] public discussion and participation in the electoral process, goals vital to a self-governing people."  *Id.* at 92-93.

Scott's more limited challenge to the matching funds available to participating candidates under Section 106.355 fares no better.  Circuit Courts have repeatedly rejected constitutional challenges to "matching fund" provisions of state public campaign finance systems.  *See McComish v. Bennett*, 2010 WL 2595288 at *1 (9th Cir. 2010) (upholding matching fund provisions of Arizona's Citizens Clean Elections Act); *North Carolina Right to Life, Inc. v. Leake*, 524 F.3d 427, 437-39 (4th Cir. 2008) (upholding matching fund provisions of the North Carolina Judicial Campaign Reform Act); *Daggett v. Comm'n on Governmental Ethics and Election Practices*, 205 F.3d 445, 463-65, 468-70 (1st Cir. 2000) (upholding matching fund provisions of the Maine Clean Election Act); *Gable v. Patton*, 142 F.3d 940, 949 (6th Cir. 1998) (upholding Kentucky's public funding trigger provision).

Given these precedents, and the further reasons below, Scott does not have a substantial likelihood of success on the merits of his constitutional challenge. Thus, he has not made the type of showing necessary to support the drastic relief of enjoining the operation of Florida's public campaign financing laws on an emergency basis just before the election.

A.     **The matching fund provisions of the Act do not burden Scott's speech.**

The ability of participating candidates to receive matching funds under Section 106.355 imposes no burdens on Scott's speech. As with the plaintiffs in *McComish*, "the essence of [Scott's] claim is not that [he] has been silenced, but that the speech of [his] opponents has been enabled." *McComish* at \*10. But the First Amendment does not guarantee a right "to outraise and outspend an opponent" or "to speak free from response." *Daggett* at 464. Rather, the First Amendment's purpose is to "secure the widest possible dissemination of information from diverse and antagonistic sources." *Id.* (citing *Buckley*, 424 U.S. at 49) (internal quotations omitted).

Scott argues that the matching fund statute has burdened his right to speak on behalf of his campaign in two ways. First, he alleges that his opponents' receipt of matching funds will "reduce" or "diminish" his own communications on behalf of his campaign. Second, he claims that his speech has been unconstitutionally "chilled" because he has structured his campaign expenditures to delay the date on which he will exceed the threshold triggering matching funds for his opponents. Neither argument is meritorious.

Florida's matching fund statute "in no way limits the quantity of speech one can engage in or the amount of money one can spend engaging in political speech, nor does it threaten censure or penalty for such expenditures." *Daggett* at 464. As a nonparticipating candidate,

Scott is "free to raise and spend as much money, and engage in as much political speech, as [he] desire[s]." *Leake*, 524 F.3d at 437.

In assessing related issues under Rhode Island's campaign finance law, the First Circuit found "difficulty believing that a statutory framework which merely presents candidates with a voluntary alternative to an otherwise applicable, assuredly constitutional, financing option imposes any burden on first amendment rights." *Vote Choice v. DiStefano*, 4 F.3d 26, 39 (1st Cir. 1993). *See also Daggett*, 205 F.3d at 464-65 (concluding that a matching funds statute imposed no First Amendment burden); *Leake*, 524 F.3d at 437-49 (same).

In this case, Scott has voluntarily chosen not to participate in Florida's public campaign finance program and has vigorously exercised his First Amendment rights as a nonparticipating candidate. Scott's Declaration states that he has spent approximately $21 million in support of his candidacy from April 9, 2010, through July 7, 2010. If true, Scott's campaign has already spent more money engaging in political speech since he entered the race than the $19.8 million spent by the winning candidate during the entire 2006 gubernatorial election (primary and general elections combined). *See* Florida Division of Elections, 2006 General Election Campaign Finance Activity, available at: http://election.dos.state.fl.us/campaign-finance/expend.asp

Nor does Scott demonstrate an unconstitutional "chilling effect" through his Declaration that he has structured some of his campaign expenditures to delay the date on which he must disclose that he has exceeded the $24.9 million threshold. "Many campaign finance regulations, particularly disclosure requirements, lead candidates to engage in such strategic behavior, but this does not make them unconstitutional." *McComish*, at *10. Even in the absence of a matching fund provision, a campaign may choose to delay its expenditures simply because, as

the Supreme Court has noted, "the public begins to concentrate on elections only in the weeks immediately before they are held." *Citizens United*, 130 S.Ct at 895. And to the extent that Scott is actually deterred from spending in excess of the threshold, "the deterrence results from a strategic, political choice, not from a threat of government censure or prosecution." *Leake*, 524 F.3d at 438.

The single Circuit Court opinion striking down a state matching funds provision is *Day v. Holahan*, 34 F.3d 1356 (8th Cir. 1994).[5] The court in *Day* found that a Minnesota matching funds provision resulted in "self-censorship" by non-participating candidates who desired to avoid triggering matching funds for their participating opponents, and further concluded that this form of self-censorship "is no less a burden on speech that is susceptible to constitutional challenge than is direct governmental censorship." *Id.* at 1360.

The courts in *Daggett* and *Leake*, however, have expressly rejected the analysis of the *Day* court. *See Daggett*, 205 F.3d at 464-465 (declining to adopt the logic of Day equating "responsive speech with an impairment to the original speaker"); *Leake*, 524 F.3d at 437-438 (rejecting "as unpersuasive the Eighth Circuit's decision in *Day*" based on the "flawed proposition" that the potential for self-censorship equates to "direct government censorship.") Both the *Leake* and *Daggett* courts also expressed doubt regarding the continuing viability of *Day* even within the Eighth Circuit. *See Leake*, 524 F.3d at 438 (discussing the inconsistencies between *Day* and the Eighth Circuit's later decision in *Rosenstiel v. Rodriguez*[6], 101 F. 3d 1544,

---

[5] Shortly before the deadline for filing this Response, the undersigned became aware of the Second Circuit's newly-released opinion in *Green Party of Connecticut v. Garfield*, Docket Nos. 09-3760-cv(L), 09-3941-cv(CON). On initial review, it appears that the *Garfield* opinion exacerbates a circuit split over the constitutionality of matching fund provisions. The Second Circuit (*Garfield*) and Eighth Circuit (*Day*) have held matching funds unconstitutional, while the First Circuit (*Daggett*), Fourth Circuit (*Leake*), Sixth Circuit (*Gable*), and Ninth Circuit (*McComish*) have upheld matching fund provisions against constitutional challenge.

[6] *Rosenstiel* upheld a separate provision of Minnesota's campaign finance law despite similar concern of "self-censorship" by participating candidates.

1555 (8th Cir 1996)); *Daggett*, 205 F.3d at 465 n.25 (noting that the "continuing vitality" of *Day* after *Rosenstiel* was "open to question").

Here, Scott has demonstrated no burden on his First Amendment right that warrants the injunctive relief he seeks.  Even if the matching funds were held to impose some indirect or minimal burden on Scott's speech, the narrowly-drawn matching funds provision of the Act serves Florida's compelling interests and should be upheld.

**B.      If the Court finds any burden on Scott's speech, intermediate scrutiny is the appropriate standard of review**

Because the availability of matching funds for participating candidates imposes no burden on the speech of nonparticipating candidates, Section 106.355 does not violate the First Amendment.  If, however, the Court concludes that matching funds impose any burden on the speech of nonparticipating candidates, they should be subject to intermediate scrutiny, not strict scrutiny as suggested by Scott.

Unlike the courts in *Daggett* and *Leake*, which found no burden imposed by matching funds, the Ninth Circuit in *McComish* concluded based on the extensive factual record before it that "any burden the Act imposes on Plaintiffs' speech is indirect or minimal."  *McComish* at *10.  Because a matching funds provision "does not actually prevent anyone from speaking in the first place or cap campaign expenditures," the *McComish* court concluded that the minimal or indirect burden created by matching funds "is most analogous to the burden of disclosure and disclaimer requirements in *Buckley* and *Citizens United*" and should be examined under "intermediate scrutiny."  *McComish* at *11-*12.

Intermediate scrutiny is less demanding than strict scrutiny, requiring only a "substantial relation" between the matching fund provisions and a "sufficiently important" governmental interest.  *McComish* at *12 (citing *Citizens United*, 130 S.Ct at 914) (internal quotation marks

omitted).  Strict scrutiny is not the appropriate standard for assessing the constitutionality of matching fund provisions.  Rather, strict scrutiny is reserved for laws that directly and substantially burden political speech.  *Citizens United v. Federal Election Comm'n*, 130 S.Ct 876, 898.  Under strict scrutiny, the government must prove "that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Id.* (citing *Federal Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449, 464 (2007) (opinion of Roberts, C.J.))

Although Section 106.355 should not be held to the burden of strict scrutiny, it should be noted that the matching funds provision would satisfy this standard because it furthers Florida's compelling interest in preventing corruption and the appearance of corruption.  In addition, the matching fund provisions in Section 106.355 satisfy intermediate scrutiny because they are "substantially related" to several other "sufficiently important" governmental interests.

### C.   The matching funds provisions are narrowly-tailored to achieve compelling governmental interests.

Because the matching fund statute does not impose any limitation on Scott's right to speak or expend funds on behalf of his campaign, the statute does not implicate any First Amendment concerns.  At most, the matching fund provisions impose an indirect burden on Scott's expenditures and should be upheld because they are substantially related to Florida's compelling interests in preventing corruption and the appearance of corruption as well as encouraging participation in the public campaign financing system as a means of preventing corruption.  *See, e.g.,* § 106.31, Fla. Stat.; *Connor*, 643 So. 2d at 77 (citing *State v. Republican Party of Florida*, 604 So. 2d 477 (Fla. 1992)).  These interests are certainly sufficient, if not compelling, when weighed against the minimal burden they impose on the speech of nonparticipating candidates such as Scott.

### (1)   Matching funds further Florida's governmental interests

The matching fund provisions of the Act further the State's interests in preventing corruption and the appearance of corruption and in encouraging participation in the public campaign financing system.  These interests should be held to satisfy the First Amendment's requirements under any standard of review.

The purpose of the Act is "to preserve the integrity of the election process by supporting candidates who are free from the influence of special interest money and to remove corruption and the appearance of corruption from that process."  *Connor*, 643 So. 2d at 77.  The prevention of corruption and the appearance of corruption have long been recognized as compelling interests that will support campaign finance regulations.

Florida also has an interest in encouraging candidates to participate in public financing under the Act.  When a state has adopted a public campaign financing alternative, the state "need not be completely neutral on the matter of public financing of elections."  *Vote Choice v. DiStefano*, 4 F.3d 26, 39 (1st Cir. 1993).  Florida has a "valid interest in having candidates accept public financing because such programs…tend to combat corruption."  *Id.* (citing *Buckley*, 424 U.S. at 91).

### (2) Matching funds are a narrowly-tailored component of the Act that are necessary to accomplish its purposes

The matching funds provisions of the Act are a narrowly-tailored means of accomplishing the purposes of the Act.  Matching funds encourage candidate participation in Florida's public campaign financing system.  § 106.31, Fla. Stat.  Candidates would be less likely to participate in a system that would prevent them from running effective and competitive campaigns, or that would necessarily put them at an extreme financial disadvantage to nonparticipating opponents.

**D.      Neither *Davis v. FEC* nor the Supreme Court's order in *McComish* supports Scott's position that Section 106.355 is unconstitutional.**

Faced with recent precedent from the First, Fourth, Sixth, and Ninth Circuits dismissing constitutional challenges to matching fund or "trigger" provisions in public campaign financing systems, Scott nonetheless maintains that Section 106.355 is unconstitutional.  His motion relies primarily on *Davis v. FEC*, a 2008 Supreme Court decision striking down the so-called "Millionaire's Amendment" contained in the Bipartisan Campaign Reform Act of 2002 ("BCRA").  2 U.S.C. § 441a-1(a).  Scott also relies on the Supreme Court's June 8, 2010 order granting a stay of the Ninth Circuit's mandate in *McComish*.  Neither of these decisions supports Scott's argument.

### (1)      *Davis* does not address matching funds or public campaign financing

In *Davis v. Federal Election Commission,* 128 S. Ct. 2759 (2008), the Supreme Court addressed the constitutionality of a provision intended to "level electoral opportunities for candidates of different personal wealth" by creating "a new, asymmetrical regulatory scheme" in any congressional race in which one candidate's expenditure of personal funds exceeded $350,000.  *Davis*, 128 S.Ct at 2667, 2773.  Under the scheme, the "self-financing" candidate remained subject to the ordinary limits on contributions but was burdened with additional disclosure requirements.  *Id.* at 2766-2777.  The "non-self-financed candidate," however, could accept individual contributions three times greater than the ordinary limit and could accept coordinated party expenditures without limit.  *Id.* at 2766.

The Supreme Court struck down the Millionaire's Amendment, reasoning that the imposition of asymmetrical contribution limits impermissibly burdened the self-funding candidate's right to use personal funds for campaign speech.  *Id*. at 2771-72.  It noted, however, that the self-funding candidate's argument "would plainly fail" if the law had simply raised the

contribution limits for all candidates. *Id.* at 2770. The Court went on to conclude that the burden imposed on self-funding candidates was not justified by any interest in preventing corruption and that "leveling" of electoral opportunities for candidates of different personal wealth is not a compelling interest. *Id.* at 2773.

The matching fund provision challenged by Scott differs from the provision at issue in *Davis* in several ways. First, unlike the Millionaire's Amendment, the matching funds available to participating candidates under Florida law are linked to total campaign expenditures by a nonparticipating candidate, <u>not</u> to the expenditure of personal funds.

Second, the *Davis* court's concerns with the "asymmetric regulatory scheme" do not apply with the same force in a voluntary public campaign financing system such as the Act. Such a system necessarily imposes different benefits and burdens on participating and non-participating candidates. Unlike *Davis*, however, the Florida Election Code does not impose asymmetric caps on individual campaign contributions. The individual contribution limits are $500 for participating and non-participating candidates alike. § 106.08, Fla. Stat.

Third, the Court found the government's stated interest in *Davis* – leveling electoral opportunities for candidates of different financial resources – to be an insufficient justification for the burden imposed on the self-financing candidate's expenditure of personal funds. In this case, it is irrelevant that a self-financed candidate expends personal funds to finance his campaign. The act that triggers the operation of Section 106.355, Florida Statutes, is the expenditure of $24.9 million, irrespective of the sources from which those funds were derived. Beyond that, the reporting and disbursement schedule in Section 106.355 ensures a 7-14 day "lag time" such that that the matching funds can never "level" the expenditures between participating and non-participating candidates.

Finally, as described above, Florida has articulated numerous legitimate governmental interests supporting Section 106.355, including the prevention of corruption and the appearance of corruption.

> ### (2)   The Supreme Court's Order in *McComish* does not address the merits of the Ninth Circuit's opinion.

As discussed above, the Ninth Circuit Court of Appeals in *McComish* upheld a matching fund provision of Arizona law against constitutional challenge.  Although Scott's Memorandum of Law claims that "[t]he impact of *McComish* on this case cannot be overstated," he manages to do just that by seeking to have this Court issue a preliminary injunction based, in substantial part, on the Supreme Court's recent Order in *McComish v. Bennett*, No. 09A1163, 2010 WL 2265319 at *1 (U.S. June 8, 2010).  Memorandum at 16.

In this one-paragraph Order, the Supreme Court granted an application to vacate the stay of the United States District Court for the District of Arizona's injunction and to stay the mandate of the United States Court of Appeals for the Ninth Circuit in case No. 10-15165 pending the filing and disposition of a petition for writ of certiorari.  The Ninth Circuit, in *McComish v. Bennett*, 2010 WL 2395288 (9th Cir. 2010), had reversed a District Court decision enjoining implementation of the matching funds provision of the Arizona's Citizens Clean Elections Act.

Scott argues that this one-paragraph Order provides "an even stronger indication" that Arizona's matching funds provision will be declared unconstitutional.  Memorandum at 15-16.  However, as Scott himself concedes, the decision to stay a mandate is <u>not</u> a decision on the merits of the underlying legal issues.  *Indiana State Police Pension Trust v. Chrysler LLC*, 129 S.Ct. 2275, 2276 (2009); Memorandum at 2.  Rather, "the propriety of [a stay] is dependent upon

the circumstances of the particular case," and the "traditional stay factors contemplate individualized judgments in each case." *Chrysler*, 129 S.Ct at 2276.

At issue in *McComish* is a distinctive Arizona statute, which specifically applies to candidates for public office in Arizona.  The Arizona statute and Florida statute are readily distinguishable.  Notably, the Arizona Citizens Clean Election Act attributes independent expenditures supporting or opposing a candidate against the participating candidate's expenditure limit.  Florida does not.  The expenditure limit for participating candidates in Florida is not only unaffected by expenditures of outside committees, Florida allows a candidate's campaign to coordinate electioneering expenditures with outside political committees without any effect on the participating candidate's expenditure limit.  § 106.011(18(c), Fla. Stat.  Scott has done exactly that in creating an affiliated "section 527 organization," the expenditures of which do not count against the $24.9 million threshold.  Declaration at p. 4, ¶ 14.

Even in cases in which an identical issue was being considered, the Eleventh Circuit Court of Appeals has repeatedly held that it is improper to rely on the grant of certiorari in another case raising an issue identical to one that the movant had raised as a basis to stay an execution.  *Schwab v. Dep't of Corrections*, 507 F.3d 1297, 1298 (11th Cir. 2007).  In *Schwab*, the Eleventh Circuit stated:

> The district court's action in granting the stay is contrary to the unequivocal law of this circuit that, because grants of certiorari do not themselves change the law, they must not be used by courts of this circuit as a basis for granting a stay of execution that would otherwise be denied. *Rutherford v. Crosby*, 438 F.3d 1087, 1093 (11th Cir. 2006) ("At least four times over the years, we have been asked to issue a stay of execution based on a grant of certiorari in another case raising an issue identical to one that the movant was raising in the case before us, an issue foreclosed by existing circuit precedent that might be overruled by the Supreme Court.  All four times we have declined to do so because the grant of certiorari does not change circuit precedent, and it makes sense to let the

> Court that is going to be deciding the issue determine whether
> there should be a stay in another case raising it.

*Id.* at 1298; *see also Robinson v. Crosby*, 358 F.3d 1281, 1284 (11th Cir. 2004) (declining to grant a stay pending the Supreme Court's decision in another case because "the grant of certiorari alone is not enough to change the law of this circuit or to justify this Court in granting a stay of execution on the possibility that the Supreme Court may overturn circuit law.")

While executions are obviously factually distinct from elections, that line of cases is nonetheless compelling. Here, the Supreme Court's Order of June 8, 2010 in *McComish* (included as Scott's Exhibit "D") provides no guidance as to whether the Court will even accept certiorari. It certainly does not presage a position on the merits. As the Eleventh Circuit stated in *Schwab*, "the Supreme Court itself probably does not know [how it will decide the case] given the fact that briefing has not even been completed in that case." *Schwab* at 1299.

For the foregoing reasons, Scott has failed to demonstrate a likelihood of success on the merits of his claim.

## II.     SCOTT HAS NOT, AND WILL NOT, SUFFER IRREPARABLE HARM

Scott fails to demonstrate that he has suffered, or will suffer, irreparable harm absent the issuance of an injunction. Because the Florida Election Campaign Financing Act does not violate the First Amendment, Scott has not, and will not, suffer any constitutionally-recognizable harm from the continued operation of the Act's matching fund provisions. Scott is free to speak and spend money to promote his campaign without limitation. To the extent his strategic decisions on where and how to spend funds have legal consequences, Scott is no differently situated than his opponents who have chosen to participate in the system. They, too, have likely made strategic decisions based on the requirements of the Florida Election Code – including the

decision to opt in to the public campaign financing system based on an assessment of the advantages and disadvantages of the system under existing law.

In arguing that his harm would be irreparable, Scott suggests that the Supreme Court's order in *McComish* was issued because no post-election remedy could compensate a candidate for the harm of allowing an election to proceed under the cloud of an unconstitutional provision. The procedural history of *McComish* is highly relevant to assessing this argument.

When the *McComish* case was originally presented to the District Court on a motion for temporary restraining order shortly before the 2008 primary elections, the District Court <u>denied</u> the temporary restraining order given the pending election and the justifiable expectations of the participating candidates. *See* Order in *McComish v. Brewer*, Case No. 2:08-cv-01550-ROS, August 29, 2008. The District Court also <u>denied</u> a subsequent motion for preliminary injunction, again based on the reliance interests of participating candidates. *See* Findings of Fact and Conclusions of Law in *McComish v. Brewer*, Case No. 2:08-cv-01550-ROS, October 17, 2008.

The Supreme Court's Order in June 2010 staying the Ninth Circuit's mandate issued only after the *McComish* case had been thoroughly briefed and argued in the District Court, in the Ninth Circuit, and in motions before the Supreme Court for nearly two years and an entire biennial election cycle.

## III. ANY HARM TO SCOTT IN DENYING THE INJUNCTION WOULD BE OUTWEIGHED BY THE DAMAGE TO THE STATE, THE PUBLIC INTEREST, AND PARTICIPATING CANDIDATES IN GRANTING THE INJUNCTION.

Enjoining the Secretary of State from enforcing the Act and distributing matching funds to eligible candidates at this time would substantially injure the State and harm the public. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers…injury." *New Motor Vehicle Bd. of Cal. v.Orrin W. Fox Co*, 434 U.S.

1345, 1351 (1997) (Rehnquist, J., in chambers).  A "presumption of constitutionality" attaches to every legislative act, and that presumption is "an equity to be considered in favor of . . . [the government] in balancing hardships."  *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers).

The harm to the public if the Secretary is enjoined from enforcing the public campaign financing law far outweighs Scott's alleged harm.  Whether the injunction is granted or denied, Scott will be able to lawfully spend any amount of money in furtherance of his candidacy.  An injunction striking the matching funds provision of Section 106.355 could threaten the viability of public campaign financing in Florida.

The Act serves Florida's interests in preventing corruption and the appearance of corruption by providing an optional public financing system for candidates who agree to limit their total campaign expenditures and, accordingly, their contributions.  § 106.31, Fla. Stat.  To accomplish the State's interest, the Act must present an attractive alternative in which candidates will participate.  Candidates will be unlikely to participate in a system that so significantly disadvantages them compared to nonparticipating candidates.  Section 106.355 is, therefore, critical to the accomplishment of the State's interests.  If the injunction is granted and the Act is stricken, candidates will not choose to participate in the system in the future and the State's interests in combating corruption will be frustrated.

Candidates who have chosen to participate in the public campaign financing system for the 2010 election cycle would also be harmed by an order enjoining the Act.  These candidates opted into the system in reasonable reliance on the existing statute.  Scott asks the Court to alter the bargain after the fact.  If the Court were to issue the preliminary injunction that Scott requests at this late hour, participating candidates would remain bound by the restrictions in the Act

(including the $25,000 limit on personal contributions) but they would not receive the matching fund benefits of the Act on which they reasonably relied.

As exemplified by the procedural history of the *McComish* case, when the *McComish* plaintiffs filed their complaint and motion for a temporary restraining order mere weeks before the primary election, the District Court refused to enjoin the operation of Arizona's matching funds statute given the disruption it would cause to the election process and the reliance by participating candidates on the availability of matching funds.  The parties in *McComish* briefed the case on cross-motions for summary judgment in 2009.  In January 2010, the District Court issued a final judgment declaring Arizona's law unconstitutional.  The Court stayed its own decision pending review in the Ninth Circuit.  After briefing and argument, the Ninth Circuit reversed the District Court's judgment and concluded that the program was constitutional.  It was the mandate from that Ninth Circuit decision that was stayed by the Supreme Court in June 2010.  Thus, candidates for the 2010 election cycle in Arizona have been on notice for nearly two years that the state's matching funds program was in jeopardy.

Here, the Secretary has been served with this lawsuit at the eleventh hour.  Both the Department and participating candidates would be significantly burdened by an order enjoining the operation of a significant provision of the statutory public campaign finance system.  In weighing the relative burdens to the Plaintiff, the Department, and participating candidates, this Court should adopt a similar approach to that taken by the District Court in *McComish* and deny the motion for a preliminary injunction.

IV.     **AN INJUNCTION WOULD NOT SERVE THE PUBLIC INTEREST**

For the additional reasons stated below, the public interest would be disserved by an order enjoining the operation of Florida's public campaign financing system in the middle of an election process already underway.

The State of Florida unquestionably has "a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (citing *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989)).  Moreover, "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell* at 4.  The courts have routinely recognized "that election cases are different from ordinary injunction cases.  Interference with impending elections is extraordinary." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003).

This Court considered the disruption of the election process when a suit was brought challenging Florida's congressional districting plan seven weeks before the first primary election.  In *Johnson v. Smith*, 1994 WL 907596  (N.D. Fla. 1994), this Court declined to enter a preliminary injunction "primarily because the court finds that the public interest would not be served by an act that would inevitably disrupt an election process already well underway."  In *Johnson*, as in this case, the qualifying period for candidates had ended, and the candidates had begun to organize their campaigns, to raise funds, and to spend those funds in reliance on the then-existing districting scheme.  This Court found that the issuance of a preliminary injunction "would produce considerable confusion, inconvenience, and uncertainty among voters, candidates, and election officials."

Similarly, in this case, the election process is well underway.  The qualifying period for nonfederal candidates ended at noon on June 18, 2010.  § 99.061, Fla. Stat.  The end of qualifying was also the deadline for candidates to elect participation in public campaign financing under the Act.  § 106.33, Fla. Stat.  The deadline for supervisors of elections to mail primary election absentee ballots to absent uniformed services voters and overseas voters passed on July 10, 2010.  § 101.62(4)(a), Fla. Stat.  Early voting for the primary election begins on August 9, 2010, less than one month from now.

The candidates have presumably organized their campaigns, are raising funds, and are spending funds based on the existing statutory framework.  At the last minute, Scott seeks to upend this statutory scheme, leaving no doubt that the issuance of a preliminary injunction would produce considerable confusion, inconvenience, and uncertainty among voters, candidates, and election officials.  The injunctive relief sought by Scott would disserve the public interest.

## **CONCLUSION**

For the foregoing reasons, the Secretary of State of the State of Florida respectfully requests that this Court deny Scott's motion for a preliminary injunction.

Respectfully submitted,

/s Richard Doran

C.B.UPTON
Fla. Bar. No.: 0037241
General Counsel
Florida Department of State
R.A. Gray Building
500 S. Bronough Street
Tallahassee, FL 32399-0250
850-245-6536
850-245-6127 (facsimile)
cbupton@dos.state.fl.us

JOHN BERANEK
Fla. Bar No.: 0005419
jberanek@ausley.com
RICHARD E. DORAN
Fla. Bar No: 0325104
rdoran@ausley.com
KENNETH R. HART
Fla. Bar No. 0192580
khart@ausley.com
MAJOR B. HARDING
Fla. Bar No.: 0033657
mharding@ausley.com
Ausley & McMullen

24

Post Office Box 391
Tallahassee, FL 32302
850-224-9115
850-222-7560 (facsimile)

Attorneys for Florida Secretary of State Dawn K. Roberts

## CERTIFICATE OF SERVICE

This is to certify that on the 13th day of July, 2010, the foregoing Response in Opposition

to Plaintiff's Motion for Preliminary Injunction was filed electronically.  Notice of this filing will

be sent to the below parties by operation of the Court's electronic filing system.  Parties may

access this filing through the court's system.

Charles M. Trippe
Mosely, Prichard, Parrish, Knight and Jones
501 West Bay Street
Jackonsville, FL 32202

Enu a. Mainigi
Carl R. Metz
George W. Hicks, Jr.
Williams & Connolly LLP
725 Twelfth Street N. W.
Washington, DC 20005

Harry O. Thomas
Radey Thomas Yon & Clark, P. A.
301 S. Bronough Street, Sutie 200
Tallahassee, FL 32301-1722

/s Richard E. Doran
Attorney