**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**RICHARD L. SCOTT,**

      **Plaintiff,**

**vs.**                                         **Case No.  4:10cv283-RH/WCS**

**DAWN K. ROBERTS, in her official
Capacity as Interim Secretary of State
of the State of Florida,**

      **Defendant,**

**and**

**IRA WILLIAM ("BILL") MCCOLLUM, JR.,**

      **Intervenor.**

_____/


**INTERVENOR'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION AND REQUEST FOR AN
EXPEDITED HEARING**

Pursuant to Northern District of Florida Local Rule 7.1(C), Intervenor Ira William

("Bill") McCollum, Jr. ("Bill McCollum" or "McCollum") files this Memorandum in

Opposition to Plaintiff Richard L. Scott's Motion for a Preliminary Injunction and

Request for an Expedited Hearing. Plaintiff's Motion must be denied because it fails to

establish the factors necessary to warrant relief. In particular, Bill McCollum would be

extraordinarily harmed by entry of the requested preliminary injunction, as would the

state's voters, who have an interest in a robust political debate in the final weeks before

the primary election.  Moreover, the Motion must be denied because the Plaintiff cannot

demonstrate a substantial likelihood of success on the merits.

A preliminary injunction is an "extraordinary and drastic remedy," *Citizens for

Police Accountability Political Committee v. Browning*, 572 F. 2d 1213, 1217 (11th Cir.

2009), *quoting McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)

(quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537

(11th Cir. 1989). Entry of a preliminary injunction "should never be indulged except in a

case clearly warranting it." *Lee v. Resor*, 348 F. Supp. 389 (M.D. Fla. 1972).  In each

case, courts "must balance the competing claims of injury and must consider the effect on

each party of the granting or withholding of the requested relief." *Winter v. Natural

Resources Defense Council, Inc.* 129 S. Ct. 365, 376 (2008), *quoting Amoco Production

Co. v. Gambell*, 480 U.S. 531, 542 (1987).  The Plaintiff has asked this Court to prevent

implementation of a key element of Florida's campaign financing structure just six weeks

before the primary election. Presented with a similar request in a case also challenging

campaign finance statutes, a District Court judge in Arizona, even after concluding the

statute was unconstitutional, declined to enter a preliminary injunction, citing the

"extraordinary balance of the harms required in the context of an ongoing election."

*McComish v. Brewer*, 2010 WL 2292213 at \*6 (D. Ariz. January 20, 2010), *reversed on

other grounds*, *McComish v. Bennett*, -- F.3d --, 2010 WL 2595288 (9th Cir. June 23,

2010).[1]

---

[1]      Plaintiff relies heavily in his Motion on the Supreme Court's recent Order
vacating the District Court's injunction and staying the mandate of the Ninth Circuit's
decision in the *McComish* case so that a petition for certiorari could be submitted.

Moreover, courts are only to interfere with elections in process in the most extraordinary of circumstances.  Even in situations where underlying aspects of an election are determined to be unconstitutional, such as an improper apportionment of districts, interference with an imminent election is not warranted.  In the landmark apportionment case of *Reynolds v. Sims*, 377 U.S. 533, 585 (1964), the Supreme Court reasoned:

> It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

(Emphasis supplied).  *See also Ely v. Klahr,* 403 U.S. 108, 113 (1971) (allowing election to proceed under unconstitutional apportionment plan); *Kilgarlin v. Hill*, 386 U.S. 120, 121 (1967) (permitting impending election to proceed despite finding that the Texas statutory provisions governing legislative appointment were invalid); *White v. Weiser*,

---

*McComish v. Bennett*, 2010 WL 2265319 (U.S. June 8, 2010).  Putting aside for the moment the merits of the District Court's or the Ninth Circuit's decisions in that case, it is important to remember that the District Court judge, although eventually finding the Arizona campaign finance scheme to be unconstitutional, refused to enjoin the implementation of the statute in the midst of an election.

412 U.S. 783, 789 (1973) (granting stay of order finding plan unconstitutional and permitting election to proceed); *Grudzinski v. Bradbury*, 2007 WL 2733826 (D. Ore. 2007) (lateness of plaintiff's request to remove a ballot measure tilts the balance of harms in favor of the state and the voting public).

Bill McCollum has elected to participate in the Florida Election Campaign Financing Act, described in sections 106.30-.36, Florida Statutes. By virtue of his participation in that system, McCollum has a reasonable expectation that the system will remain in place through the 2010 election cycle and that he will receive funds that will become available pursuant to section 106.355 once Scott exceeds the $24.9 million threshold. As more fully described below, McCollum's campaign has advertising and fund raising strategies in place and has planned its use of the funds authorized by section 106.355.   If this Court enters a preliminary injunction prohibiting implementation of section 106.355 funds, McCollum's campaign will lack the funds needed to implement the plan in the last weeks of the election and his freedom of speech will be curtailed. This chilling effect on Bill McCollum's free speech rights is just one of the reasons the Plaintiff's Motion must be denied.

I.    **BILL MCCOLLUM HAS REASONABLY RELIED ON FUNDS BECOMING AVAILABLE PER SECTION 106.355, AND GRANTING THE INJUNCTION WILL SEVERELY IMPEDE HIS ABILITY TO GET HIS MESSAGE TO VOTERS IN THE FINAL WEEKS OF THE PRIMARY CAMPAIGN.**

If the Plaintiff's Motion for Preliminary Injunction is granted, Bill McCollum will suffer immediate harm.   Bill McCollum elected to participate in Florida's election campaign financing system "[a]fter considering the benefits of the Act, as well as the

4

restrictions placed on a candidate by the Act . . . ." *See* Affidavit of Ira William ("Bill") McCollum, Jr. (attached as **Exhibit A**).[2]   Section 106.355 provides that whenever a candidate for Governor who has not elected to participate in the system exceeds the applicable expenditure limit – $24.9 million for this election cycle – the Department of State shall, upon request, provide the participating candidate with funds equal to the amount by which the non-participating candidate exceeded the expenditure limit. If the preliminary injunction requested by Plaintiff is granted, Bill McCollum loses that benefit, but still is subject to most of the Act's restrictions.  He states in his affidavit:

> Mr. Scott now asks this Court to drastically alter the playing field in this election by enjoining the Act's provisions that provide protections to me for his exceeding the spending cap but leaving in effect all of the Act's restrictions on my ability to obtain contributions in amounts that would offset Mr. Scott's spending.
>
> If the injunction is entered as requested by Mr. Scott, I will no longer be subject to the $24.9 million spending limit but I will still be prohibited from loaning my campaign more than $25,000 from my personal funds and subject to an audit by the state at the close of the campaign.  Of course, the statutory limitations on contributions by individual donors and by executive committees of political parties will still be in effect.

*Id*. at ¶¶ 7-8.

As a participating candidate, Bill McCollum has a substantive legal right to require the Department of State to pay him the funds when the Plaintiff exceeds the expenditure limit. The Bill McCollum campaign is counting on receiving these funds and has planned a media strategy that will be paid for by these funds.  *See* Affidavit of Jack

---

[2]      By electing to participate in the Florida Election Campaign Financing Act, Bill McCollum is prohibited from loaning his campaign more than $25,000 from his personal funds and from spending more than $2 for each Florida-registered voter, which is $24.9 million.   He also is required to submit to a post-election audit by the Division of Elections. McCollum Affidavit, at ¶ 5.

Matthew Williams, campaign manager for the Bill McCollum Campaign (attached as **Exhibit B**) (also attached as Exhibit 1 to D.E. 13). As Williams attests, the campaign has been monitoring the Plaintiff's media expenses since he entered the race in April of this year. *Id*. at ¶ 6. Because of the significant amount spent on media advertising by the Plaintiff, the Bill McCollum campaign altered its original plans for its own media campaign and began purchasing radio and television advertisements earlier than originally planned. *Id*. at ¶ 7. As the Plaintiff's spending on advertising continued, the Bill McCollum campaign concluded that the Plaintiff was likely to exceed the $24.9 million expenditure limit, despite his public promise that he would not do so. *Id*. at ¶ ¶ 8-9.

Recognizing that the Plaintiff's incredible expenditures will result in a dollar-for-dollar distribution of funds to the Bill McCollum campaign, the campaign has made plans for how it will spend the additional money it will receive seven days after the cap is exceeded. *Id.* at ¶ 10. Campaign staff members have estimated that the section 106.355 funds could amount to as much as $16 million before the August 24 primary election. *Id*. at ¶ 11. That money will be used to buy television and radio advertisements all over Florida to communicate Bill McCollum's message concerning how he would govern the state of Florida. Any disruption in Bill McCollum's planned media strategy at this late date would put him at an extreme disadvantage in this very competitive election. *See* Affidavit of Stephen R. Hazleton at ¶ 6 (attached as **Exhibit C**).

If a preliminary injunction is granted, the Bill McCollum campaign will have to go through the time-consuming process of recreating its advertising and fundraising

strategies in the crucial final weeks before the primary election at a time when most voters are just beginning to focus on the candidates. *Id*. at ¶ 3. An unexpected change in the law at this late date would unfairly penalize Bill McCollum and deprive the campaign of funds that it has been expecting to receive and that it intends to use for advertising and other campaign strategies. As Hazleton, a professional media consultant, explains in his affidavit, the last few weeks of a campaign are the most important time for a candidate to have his advertisements on the air, as it is the time when the public is most interested. *Id*. Thus, it is Bill McCollum's First Amendment rights that will be infringed by the entry of a preliminary injunction. He will be unfairly punished for abiding by the law as written and will be unable to get his message to voters in a manner that he had reasonably planned in reliance on the section 106.355 funds.

In considering whether to grant a preliminary injunction, a court must "balance the equities in determining whether, in the exercise of its discretion, a preliminary injunction is warranted." *Faculty Senate of Florida Intern. University v. Winn*, 477 F. Supp. 2d 1198, 1209 (S.D. Fla. 2007); *see also Martinez v. School Bd. of Hillsborough County*, 675 F. Supp 1574, 1582 (M.D. Fla. 1987) ("It is the duty of this Court to weigh all factors in this case and balance the competing interests, in order to determine if a preliminary injunction is appropriate.")

Notably, Plaintiff executed a Statement of Candidate on April 13, 2010, stating that he had received, read and understood the requirements of Chapter 106, Florida Statutes (attached to the Affidavit of Bill McCollum, **Exhibit A**). Yet he waited until July 7, 2010, to challenge the constitutionality of the provision in section 106.355 that

provides funds to candidates such as McCollum, who elected to participate in the public campaign financing system.  Such an eleventh-hour ambush should not be rewarded with equitable relief.  If anything, the needless delay here tilts the balance of equities in favor of Bill McCollum.  If Plaintiff understood the provisions of Chapter 106 three months ago, as he stated, he presumably believed then that part of section 106.355 was unconstitutional.  He should have challenged it at that time. *Grudzinski,* 2007 WL 2733826 at *3 (lateness of plaintiff's request to remove a ballot measure tilts the balance of harms in favor of the state and the voting public and raises a valid claim of laches against plaintiffs to preclude injunctive relief).

At this point in the election, almost all absentee ballots have been mailed. McCollum Affidavit at ¶ 6.  Strategies have been planned, and the final push for votes is about to begin.  As Bill McCollum attests:

> In reliance on the protections provided by the Act, my campaign, in response to the significant spending by Mr. Scott, altered the timing of planned expenditures fully expecting that Mr. Scott would, if he has not already, exceed the spending limit and that section 106.355 funds would be available to my campaign during the critical last weeks before the election.
>
> Given the short period left to raise money by contributions and the chilling effect on potential donors of the specter that my campaign will not have sufficient funds to effectively communicate my political message to the electorate, if the section 106.355 funds are withheld from me at a time when the electorate is most attentive, it will be impossible for my campaign to generate contributions in an amount that would equal or even approach the amount of the lost section 106.355 funds.

*Id*. at ¶¶ 9-10.

The entry of the requested preliminary injunction here would hobble Bill McCollum's entire campaign strategy and essentially eliminate his ability to

communicate with Florida's Republican voters in the final weeks of the campaign for Governor.  Entry of a preliminary injunction also would have a chilling effect on potential contributors to the McCollum campaign, as it will exacerbate a perception that he will not have sufficient funds to counter the millions being spent by his opponent. McCollum Affidavit at ¶ 11. Against the backdrop of this irreparable consequence and impact, Plaintiff's complaint of a "drag" on his First Amendment rights is of no moment. As his Declaration proves, the Plaintiff is not an inaudible victim. In balancing the equities, this Court should find that the harm to Bill McCollum outweighs any harm to the Plaintiff.  Plaintiff has failed to prove otherwise.

## II.   THE PUBLIC ALSO WOULD BE HARMED BY AN INJUNCTION IN THE MIDST OF AN ELECTION, AS ROBUST DEBATE WOULD BE CURTAILED AND THE ELECTION PROCESS WOULD BE DISRUPTED.

If the preliminary injunction is granted, not only would Bill McCollum be harmed, but the voters of Florida will be harmed as well.  As the primary election approaches, the vast majority of voters begin to pay close attention to the candidates and their messages for the first time. *See* Hazleton Affidavit at ¶ 3. If Bill McCollum is deprived of the millions of dollars in section 106.355 funds he is expecting, the voters will not hear his message.  Instead, they will hear only one voice, that of the candidate who can afford to spend as much as he wants.

The importance of a robust debate on public issues has been repeatedly emphasized by courts. *E.g., Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976) (recognizing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open") (quoting *New York Times Co. v. Sullivan*, 376 U.S.

254, 270 (1964)); *Florida Committee for Liability Reform v. McMillan*, 682 F. Supp. 1536 (M.D. Fla. 1988) (public interest in robust debate on public issues would be furthered by enjoining enforcement of statute prohibiting solicitation within 150 feet of polling places); *Clean-Up '84 v. Heinrich,* 582 F. Supp. 125 (M.D. Fla. 1984) ("All citizens have an interest in robust debate on public issues."). Entry of the preliminary injunction Scott requests would chill public debate, not further it.

The United States District Court for Arizona faced a similar situation two years ago when the Arizona Citizens Clean Elections Act, the public financing scheme for that state, was challenged by a number of plaintiffs.   Although the Arizona system differs in certain respects from Florida's, it does include a provision that provides additional funds to publicly-funded candidates when non-publicly funded candidates exceed certain campaign expenditure and fundraising limits.   The plaintiffs argued that their First Amendment rights were violated by this funding scheme and sought both a preliminary injunction to block distribution of matching funds to participating candidates and a temporary restraining order ("TRO") to enjoin enforcement of the matching funds provisions of the Act.   *McComish*, 2010 WL 2292213 at *6.  Both motions were denied. In her Order denying the TRO, Judge Roslyn O. Silver reasoned that the balance of harms analysis was not simple in a case of this nature:

> On the one hand, Plaintiffs suffer a burden on their First Amendment rights and have proffered some evidence that the candidates opposing them benefit directly from that opposition. On the other hand, the State Defendants have a clear interest in running a smooth and orderly election which, in this case, includes a significant number of candidates who have been operating under the assumption that matching funds would be distributed and planning their campaign strategies accordingly.   Those disadvantaged candidates are not currently parties to this litigation, but

disrupting their expectations of funding shortly before an election surely interferes with the State's interest in holding a fair, contested election. Furthermore, <u>courts have traditionally treated injunctions in election cases differently than in other contexts, as "[i]n this case, hardship falls not only upon the putative defendant" but on all citizens of the state.</u> *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003).

Order in *McComish v. Brewer*, CV-08-1550-PHX-ROS at p. 7-8, August 9, 2008 (attached as **Exhibit D**) (emphasis supplied).

In her Findings of Fact and Conclusions of Law in support of her denial of the plaintiffs' motion for preliminary injunction, Judge Silver reasoned that "i[t] is not only the parties to this suit that would be affected by issuance of an injunction. Each candidate that stands to trigger or receive matching funds, and the public itself, which has an overriding interest in free and fair elections, also stand to gain or lose by an injunction." Findings of Fact and Conclusions of Law in *McComish v. Brewer*, CV-08-1550-PHX-ROS at p. 15 (attached as **Exhibit E**). Judge Silver concluded:

> [I]in the extraordinary context of an election in progress, Plaintiffs and Plaintiff-Intervenors have not demonstrated sufficient harm to find that the balance of harms and the public interest tilts in their favor. <u>The countervailing harm that would be done to candidates that relied on Clean Elections funding and the significant interest the public has in the smooth functioning of an election, one that would be compromised if participating candidates were unable to deliver their message to voters as planned, are sufficient to push the balance of harms in their direction, especially as the election is upon us.</u> This Court will not interfere with the fortuitous currents and eddies of this vital democratic process. Simply, the public interest would not be served by granting an injunction.

*Id*. at p. 18.

Similarly, in Florida, candidates such as McCollum, who have chosen to participate in Florida's public campaign finance system and have relied on funds

becoming available if a non-participating candidate exceeds the mandatory cap, will be harmed if an injunction is entered in the midst of the election process.  The voters also will be harmed, as they will be deprived of McCollum's message at a crucial point in the campaign. Thus, the balance of harms in this case, as in *McComish*, tilts in favor of McCollum and the public, and the Motion for Preliminary Injunction should be denied.

### III.   PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE HE MISREADS THE SUPREME COURT'S OPINION IN *DAVIS* AND OVERSTATES THE SIGNIFICANCE OF THE COURT'S RECENT ORDER IN *MCCOMISH*.

Section 106.355 is presumed to be constitutional.  Statutes come to the Court "clothed with a presumption of constitutionality." *Bush v. Holmes*, 919 So. 2d 392, 405 (Fla. 2006); *Department of Legal Affairs v. Sanford-Orlando Kennel Club, Inc.*, 434 So. 2d 879, 881 (Fla. 1983).  In addition, "all reasonable doubts as to the validity of statutes under the Constitution are to be resolved in favor of constitutionality." *In re Caldwell's Estate*, 247 So. 2d 1, 3 (Fla. 1971); *see also DuFresne v. State*, 826 So. 2d 272, 274 (Fla. 2002) (where reasonably possible a statute will be interpreted by the courts in a manner that resolves all doubt in favor of its validity); *Crist v. Florida Ass'n of Criminal Defense Lawyers, Inc.*, 978 So. 2d 134, 139 (Fla. 2008) (stating that in order to overcome the presumption of constitutionality, "the invalidity must appear beyond reasonable doubt, for it must be assumed the legislature intended to enact a valid law").

Plaintiff, in his Memorandum of Law in support of his Motion for Preliminary Injunction, relies primarily on two cases for his argument that he is likely to succeed on the merits.  These are *Davis v. Federal Election Commission*, 128 S. Ct. 2759 (2008) and an Order of the Supreme Court vacating the Ninth Circuit's stay of the injunction

imposed by the District Court and staying the mandate of the Ninth Circuit in *McComish*.[3]   The Plaintiff's reading of *Davis* is too broad, as the case is factually distinguishable from this one.   Additionally, the Plaintiff relies too much on the Supreme Court's Order in *McComish*, which is not a decision on the merits but merely an indication that the Court is interested in hearing the case.

The *Davis* case involved the federal Bipartisan Campaign Reform Act of 2002 and its so-called "Millionaire's Amendment," which increased the amount of contributions a candidate for the U.S. House of Representatives could receive from individual contributors when his or her opponent's personal expenditures exceeded a certain amount.   The Millionaire's Amendment provided that when a candidate's expenditure of personal funds caused the "opposition personal funds amount" ("OPFA") to exceed $350,000, the opposing candidate could receive individual contributions of three times the legal limit.   The OPFA "is a statistic that compares the expenditure of personal funds by competing candidates and also takes into account to some degree certain other fundraising." *Davis*, 128 S. Ct. at 2766.   Thus, once a candidate becomes "self-financing" by exceeding the OPFA limit, that candidate's opponent is permitted to raise additional money through higher contribution limits, but the "self-financing" candidate must continue to abide by normal contribution limits.

---

[3]      After more than a year of litigation, the U.S. District Court of Arizona invalidated the Arizona Citizens Clean Elections Act on January 20, 2010, and enjoined its enforcement, after finding that its matching funds provision violated the First Amendment. The Ninth Circuit reversed on May 21, 2010 (opinion amended on June 23, 2010), concluding that any burden imposed on the plaintiffs' speech was indirect or minimal, as the matching funds provision did not actually prevent anyone from speaking. *McComish*, 2010 WL 2595288 at *11.

The Supreme Court found that the "asymmetrical limits" on contributions violated the First Amendment, reasoning that "[w]e have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other, and we agree with Davis that this scheme impermissibly burdens his First Amendment right to spend his own money for campaign speech."  128 S. Ct. at 2771.

An analysis of *Davis* in the Harvard Law Review argues that the case has been read much too broadly by other commentators who have suggested, as Plaintiff does, that it calls into question the constitutionality of state campaign financing schemes. Comment, 122 Harv. L. Rev. 375 (Nov. 2008):

> [S]ome have suggested that *Davis's* reasoning carries broader implications that draw into question the public financing laws of many states. According to these commentators, the Court's characterization of the BCRA's asymmetrical restriction scheme as an unconstitutional burden on self-financing candidates' speech implies that asymmetrical public financing schemes must also unconstitutionally burden speech. This reading of Davis is understandable, but ultimately incorrect.  It oversimplifies and overbroadens the Court's reasoning, and it ignores the critical constitutional distinction between government restrictions on speech and government subsidies of speech. While the Court may well set its sights on asymmetrical public funding, Davis is hardly the warning shot these commentators think it is.

*Id*. at 380-81.

Like Florida, a number of states have "asymmetrical" public funding schemes by which candidates who participate in the state's public financing system receive additional funds from the state once a non-participating opponent exceeds a certain cap.  Most of these statutory schemes that have been challenged have been upheld.  *See Gable v. Patton*, 142 F.3d 940 (6th Cir. 1988) (upholding a Kentucky statute that lifted the expenditure cap and provided a two-for-one match for participating candidates once a

non-participating candidate exceeded that cap); *Daggett v. Commission on Governmental Ethics and Election Practices*, 205 F.3d 445 (2000) (upholding the matching funds provision of Maine's Clean Elections Act); *North Carolina Right to Life Committee for Independent Political Expenditures v. Leake*, 524 F.3d 427 (2008) (upholding a public financing program providing supplemental "rescue" payments to opponents accepting financing if nonparticipants' expenditures exceeded a specified threshold); *McComish*, 2010 WL 2595288 (upholding Arizona matching fund scheme whereby a participating candidate receives additional matching funds from the state once a non-participating opponent spends more than a set amount); *but see Day v. Holahan*, 34 F.3d 1356 (8th Cir. 1994) (finding unconstitutional a Minnesota statute providing an increase in expenditure limits and providing public funds to a candidate once certain amounts of independent expenditures were made to defeat the candidate); *Green Party of Conn. v. Garfield*, No. 09-3760-cv(L), -- F.3d -- (2d Cir. July 13, 2010) (finding unconstitutional a Connecticut provision that provides matching funds for participating candidates who are outspent by a non-participating opponent).

As the Ninth Circuit explained in *McComish,* the regulatory framework struck down in *Davis* is much different from the Arizona public financing system.  Under the Arizona system, a candidate who chooses to participate in the voluntary public financing scheme relinquishes his or her right to raise private campaign contributions.  Instead, the candidate receives an initial grant of funds from the state.  If the participating candidate has an opponent who is not participating in the system and whose campaign expenditures or contributions exceed a threshold set by the statute, the participating candidate receives

additional matching funds from the state.  *McComish*, 2595288 at *1.  The Ninth Circuit

reasoned:

> In *Davis*, the Millionaire's Amendment was an attempt to 'level electoral opportunities for candidates of different personal wealth.' This was problematic because *Buckley* had held that 'the First Amendment simply cannot tolerate [a] restriction upon the freedom of a candidate to speak without legislative limit on behalf of his own candidacy.' . . . Under the [Arizona] Act, while matching funds are calculated based on the total contributions received and expenditures made by a nonparticipating opponent, they are not distributed specifically to the opponents of wealthy candidates. Matching funds do not distinguish between different sources of nonparticipating candidates' financing at all.  <u>The law in *Davis* was problematical because it singled out the speakers to whom it applied based on their identity.  The Act's matching funds provision makes no such identity-based distinctions.</u>

*Id*. at *9, *quoting Davis*, 128 S. Ct. at 2773 and *Buckley* at 424 U.S. at 54 (emphasis

supplied).

Florida's campaign financing system, like Arizona's and those of a number of

other states, does not single out speakers based on their wealth. Nor does it restrict

speech, as the Millionaire's Amendment did, by allowing one candidate to raise more

money than his or her opponent simply because the first candidate was raising money

from individuals and the opponent was self-financing. Rather, Florida's public financing

system <u>promotes</u> speech based on an opponent's exercise of his or her own free speech

rights.   As the Harvard Law Review commentator noted, the distinction in First

Amendment jurisprudence between government promotion of speech and government

restriction of speech is significant.  122 Harv. L. Rev. at 383.  The author noted:

> Justice Alito [writing for the majority in *Davis*] did characterize asymmetrical contribution limits as a 'burden' on speech. But he was careful not to say that any policy measure that arguably gives one candidate more speech power is an unconstitutional burden. Instead, he

merely reasoned that restricting a candidate's speech based on his decision to exercise his speech rights is an unconstitutional burden. Promoting a candidate's speech based on an opponent's exercise of his speech rights is a different matter. While both kinds of regulation might seek to level the field between the candidates, only one does so by affirmatively limiting a candidate's First Amendment right to speak.

*Id*.

Another court evaluating public campaign finance systems similar to Florida's[4] have found that providing additional funds to participating candidates when a non-participating candidate exceeds a certain spending amount promotes speech rather than restricts it. The Court in *North Carolina Right to Life Committee Fund* found:

> We conclude that the state's provision of matching funds does not burden the First Amendment rights of nonparticipating candidates . . . . The plaintiffs remain free to raise and spend as much money, and engage in as much political speech, as they desire. They will not be jailed, fined, or censured if they exceed the trigger amounts. The only (arguably) adverse consequence that will occur is the distribution of matching funds to any candidates participating in the public financing system. But that does not impinge on the plaintiff's First Amendment rights. To the contrary, the distribution of these funds 'furthers, not abridges, pertinent First Amendment values' by ensuring that the participating candidate will have an opportunity to engage in responsive speech.

524 F.3d 427, 437, *quoting Buckley*, 424 U.S. at 92-93.

Unlike in *Davis*, Florida's section 106.355 funds provision does not manipulate a candidate's ability to accept contributions based on whether or not that candidate is participating in the public financing system. Thus, the *Davis* case is distinguishable.

Concerning the Supreme Court's June 8, 2010 Order in *McComish*, little can be said other than that the state of the law, as articulated by the Ninth Circuit in that case, is

---

[4]     Each of the states' public campaign financing system is different.  But they share a common theme that expenditures by a non-participating candidate above a certain amount trigger an allocation of public funds to the participating candidate.

unsettled.  The Supreme Court may or may not grant a petition for certiorari.  If and until

it does, and if until the Court issues its own opinion, it is simply not accurate or correct to

say that the Ninth Circuit's opinion in *McComish* is not good law.

Thus, Plaintiff's arguments about why he is likely to succeed on the merits are not

well-founded.  This Court may find *Davis* distinguishable and find the analysis in such

cases as *North Carolina Right to Life Committee Fund* persuasive.

## IV.    CONCLUSION

Granting injunctive relief to the Plaintiff just six weeks before the August 24,

2010, Republican primary in the Florida Governor's race would cause considerable harm

both to Bill McCollum and to the voting public, who are entitled to a robust debate

during the campaign between these two candidates.  Bill McCollum has made strategic

campaign plans in reliance on the funds he is entitled to receive once his opponent

exceeds the $24.9 million cap, and to deny him those funds through a preliminary

injunction would be inequitable.  Thus, the balance of equities favor McCollum and the

voters in this case.  Moreover, the Plaintiff has not demonstrated a likelihood of success

on the merits.  He overreaches in his analysis of the *Davis* case, which is distinguishable,

and he makes too much of the Supreme Court's recent Order in *McComish*. For the

reasons expressed, Bill McCollum respectfully requests that this Court deny Plaintiff's

Motion for a Preliminary Injunction.

Respectfully submitted,

/s/ Christopher B. Lunny
CHRISTOPHER B. LUNNY (008982)
clunny@radeylaw.com

HARRY O. THOMAS (195097)
hthomas@radeylaw.com
DONNA E. BLANTON (948500)
dblanton@radeylaw.com
Radey Thomas Yon & Clark, P.A.
Post Office Box 10967 (32302)
301 S. Bronough Street, Suite 200
Tallahassee, Florida  32301-1722
Telephone:      (850) 425-6654
Facsimile:      (850) 425-6694

**COUNSEL FOR INTERVENOR
WILLIAM MCCOLLUM**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing will be furnished by the Court via the CM/ECF system this 13th day of July, 2010, to the following:

Enu A. Mainigi
Carl R. Metz
George W. Hicks, Jr.
Williams & Connolly, LLP
725 Twelfth St. N.W.
Washington, DC 20005

Charles M. Trippe
Moseley, Prichard, Parrish, Knight and Jones
501 West Bay Street
Jacksonville, FL 32202

John Beranek
Richard E. Doran
Kenneth R. Hart
Major B. Harding
Ausley & McMullen
Post Office Box 391
Tallahassee, FL 32302

/s/ Christopher B. Lunny
CHRISTOPHER B. LUNNY